**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|                              |   |                         |
|------------------------------|---|-------------------------|
| UNITED STATES OF AMERICA,    | ) |                         |
|                              | ) | No. 23 CR 129           |
| v.                           | ) |                         |
|                              | ) | Judge Virginia M. Kendall |
| LAVOIA HARDY.                | ) |                         |
|                              | ) |                         |

## MEMORANDUM OPINION AND ORDER

Chicago police officers found defendant Lavoia Hardy asleep in his car with a handgun by his side. A grand jury indicted Hardy, who had previously been convicted of a felony, with the unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He now moves to dismiss his case, arguing that the charges against him violate the Second Amendment. (Dkt. 20). For the following reasons, the Court denies the motion.[1]

## BACKGROUND

On August 6, 2022, Chicago police officers received a call from a concerned citizen that Hardy appeared unconscious behind the wheel of his car. (*Id.* at 1–2). Upon arriving at the scene, the police officers noticed that both front car windows were rolled down. (Dkt. 23 at 1). Through the open window, the officers saw a handgun with an extended magazine wedged between the center console and the driver's seat. (*Id.*) The officers opened the car door, removed the firearm, and arrested Hardy. (*Id.*) The officers also searched his vehicle and found 25 individually wrapped bags of cocaine. (*Id.* at 1–2). At the time of his arrest, Hardy had numerous prior felony convictions

---

[1] Hardy's reply in support of his motion to dismiss was untimely and did not comply with Local Rule 7.1. The Court will excuse Hardy's tardy brief this one time. Going forward, Hardy is advised to comply with the Court's briefing schedule and the Local Rules.

for drug offenses, including the manufacture and delivery of a controlled substance, and a firearm offense. (Dkt. 20 at 2; Dkt. 23 at 2).

A grand jury indicted Hardy on March 2, 2023 with one count of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1); one count of unlawful possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and one count of possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c). (Dkt. 23 at 2). Hardy now moves to dismiss the indictment, raising a Second Amendment challenge. (Dkt. 20).

## LEGAL STANDARD

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," Fed. R. Crim. P. 12(b)(1), such as a constitutional violation. *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996). When considering a motion to dismiss a criminal indictment, the Court assumes all facts are true and views them in the light most favorable to the government. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case.").

## DISCUSSION

Following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), this Court has addressed three motions to dismiss indictments challenging the constitutionality of § 922(g)(1) as applied to defendants with prior violent felony convictions. *See United States v. Johnson*, No. 23 CR 156, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023); Order, *United States v. Clark*, No. 20 CR 805, No. 146 (N.D. Ill. Sept. 7, 2023); *United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076 (N.D. Ill. Mar. 28, 2023). In all three cases,

this Court denied the motions, ruling that § 922(g)(1) remains constitutional under *Bruen*. Unlike the three earlier challengers, Hardy is a non-violent felon. Regardless, his motion fails.

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court in *Bruen* established the new test for assessing the constitutionality of firearm regulations, holding that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. 2111, 2129–30 (2022). The government then bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

Under *Bruen*'s test, the Court will first address whether Hardy's alleged conduct is covered under the plain text of the Second Amendment. If yes, the Court will then evaluate whether the government has met its burden to show that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation." *Id*. at 2126.

## I.      Plain Text

The "people" of the Second Amendment are not dangerous felons, so the restriction of their rights to bear arms is not an infringement on the Constitution. The Supreme Court in *District of Columbia v. Heller* analyzed the text, history, and tradition of the Second Amendment and concluded that the right to bear arms extends only to "law-abiding citizens" as it "elevates above all other interests the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home." 554 U.S. 570, 625, 635 (2008) (emphasis added). Two years later, *McDonald v. City of Chicago* pointedly stated that its holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" 561 U.S.

742, 786 (2010) (quoting *Heller*, 554 U.S. at 626). And *Bruen* reaffirmed this principle from *Heller* and *McDonald*, characterizing the Second Amendment as a right belonging to "law-abiding" citizens 14 times. *See, e.g.*, *Bruen*, 142 S. Ct. at 2156 (holding that the New York firearm statute "violates the Fourteenth Amendment in that it prevents *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms") (emphasis added); *see also id.* at 2122, 2125, 2131, 2133–34, 2135 n.8, 2138 & n.9, 2150.

In his motion to dismiss, Hardy asks this Court to cast aside the unequivocal statements in three Supreme Court cases on the Second Amendment because they are dicta. Instead, Hardy relies on *Range v. Attorney General United States of America*, a Third Circuit case, to show that "the people" do include individuals with prior felony convictions. 69 F.4th 96, 103 (3d Cir. 2023). In *United States v. Johnson*, the Court stated that it did not find *Range* persuasive because it was an out-of-circuit case with a narrowly crafted holding to specifically address whether the *Range* plaintiff, a non-violent felon, was protected by the Second Amendment as opposed to Johnson, a man previously convicted of murder. *See Johnson*, 2023 WL 6276562, at *2. Since Hardy is also a non-violent felon, *Range* is facially more relevant, but the Court still finds the case distinguishable and unpersuasive.

*Range* presents several criticisms of the Supreme Court's phrase: "law-abiding, responsible citizens." The Third Circuit first argues that references to "law-abiding, responsible citizens" in *Heller*, *McDonald*, and *Bruen* are dicta. 69 F.4th at 101; *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) ("While some of *Heller*'s language does link Second Amendment rights with notions of 'law-abiding'…those passages do not attempt to reflect an attempt to define the term 'the people.' We are reluctant to place more weight on these passing references than the Court itself did."). *Heller* held that the Second Amendment guarantees "all

Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. 554 U.S. at 581, 626–27. Despite penning "all Americans," the Supreme Court observed that the right belonged to "law-abiding, responsible citizens" and not to "felons and the mentally ill." *Id.* at 625–26. The Court is therefore skeptical that "law-abiding, responsible citizens" is dicta because it limits the scope of *Heller*'s holding.

Moreover, *Heller*'s statement—that the Second Amendment protects only law-abiding people—can no longer be considered a "passing reference" by the Supreme Court. Evaluating *Heller*, *McDonald*, and *Bruen* together, the Supreme Court has repeatedly asserted and guaranteed that the Second Amendment protects law-abiding citizens, not convicted felons. Several concurring justices in *Bruen* went out of their way to reiterate this principle. *See Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense."); *id.* at 2162 (Kavanaugh, J., concurring) ("Nothing in [*Bruen*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." (quoting *Heller*, 554 U.S. at 626)). And while there is no binding precedent on whether the Second Amendment's plain text covers convicted felons' possession of firearms, Hardy has not pointed to any Supreme Court case preceding *Heller* indicating that the Second Amendment extends to firearm possession by convicted felons. Thus, even if such a principle is "dicta," the Supreme Court's continuous reaffirmations strongly signal that it is not something for lower courts to ignore.

*Range* further criticizes the phrase "law-abiding, responsible citizens" as expansive and vague. *See* 69 F.4th at 102 ("We are confident that the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer among 'the people' protected by the Second Amendment."). From the jump, the Court does not find the

phrase so vague. The scope of "law-abiding, responsible citizens" is cabined by "longstanding prohibitions on the possession of firearms by *felons and the mentally ill*." *Heller*, 554 U.S. at 626 (emphasis added).

Even if "law-abiding responsible citizens" is vague and overbroad dicta, Hardy's reliance on *Range* is misplaced. *Range* does not hold that felons, as a group, can possess firearms—the holding is far narrower. *See Range*, 69 F.4th at 106; *see also, e.g., Binderup v. Attorney Gen. U.S.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgment) ("[T]he Founders understood that not everyone possessed Second Amendment rights."). The *Range* Court held that § 922(g)(1) is unconstitutional when applied to "people like Range," a man convicted of making a false statement to obtain food stamps in violation of a Pennsylvania misdemeanor. 69 F.4th at 98, 106. The *Range* Court established the floor of § 922(g)(1)'s constitutionality, but it did not opine on its ceiling. So, the *Range* Court's silence raises a line-drawing exercise without providing guidance on where to draw the line for other non-violent felonies.

As discussed further below, a historical rationale for firearm dispossession is preventing dangerous individuals from threatening to do harm. *See, e.g.*, *Bruen*, 142 S. Ct. at 2148 (discussing how colonial surety laws did not ban public carry of firearms, but targeted only those "armed offensively, to the fear or terror of the good citizens of this Commonwealth") (quoting 1795 Mass. Acts and Laws ch. 2, at 436, in Laws of the Commonwealth of Massachusetts). Accordingly, this Court has upheld the constitutionality of § 922(g)(1) when applied to violent felons because of the clear danger they pose to society. *See Johnson*, 2023 WL 6276562, at *1 (murder conviction); *Dixon*, 2023 WL 2664076, at *1 (reckless homicide conviction); *see also Kanter v. Barr*, 919 F.3d

437, 464 (7th Cir. 2019) (Barrett, J., dissenting) (explaining that "the state can take the right to bear arms away from a category of people that it deems dangerous").

But danger is not limited to actual violence: "drug crimes are [also] associated with dangerous and violent behavior." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). Hardy's numerous felony convictions, including for manufacturing and distributing a controlled substance, place Hardy squarely within the definition of a dangerous, habitual criminal who should not be able to possess a firearm. *See United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people."); *id*. at 684 (finding "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use") (citing *United States v. Lane*, 252 F.3d 905, 906 (7th Cir. 2001)); *see also, e.g.*, *Hatfield v. Barr*, 925 F.3d 950, 952 (7th Cir. 2019) (holding that § 922(g)(1) applies to a felon convicted of fraud). To be clear, the Court is not proposing a bright-line test. Rather, the Court elaborates on its previous reasoning in *Johnson* that regardless of where the line is drawn, Hardy's criminal record places him outside the meaning of the "the people" under the Second Amendment.

Next, the *Range* Court argues that the meaning of "the people" in the Constitution does not vary from provision to provision. *See* 69 F.4th at 101–02 ("It mentions 'the people' twice with respect to voting for Congress, 'the people' are recognized as having rights to assemble peaceably, to petition the government for redress, and to be protected against unreasonable searches and seizures."). If someone like Hardy is not among "the people" under the Second Amendment, the argument goes, then he cannot be among "the people" under the First or Fourth Amendments. *Id.* at 102. Not so. Understandably, the *Range* Court strives to adopt a consistent reading of "the people" across the Constitution. Although the effort makes intuitive sense, a consistent reading of

"the people" is in tension with the reality that people lose certain constitutional rights when they are convicted of a felony. As the government points out, felons forfeit a number of rights that belong to "the people," including the rights to serve on a jury, to hold office, and to vote. *See, e.g.*, *United States v. Rice*, No. 3:22-CR-36, 2023 WL 2560836, at *7 (N.D. Ind. Mar. 17, 2023) ("[I]t is hard to reconcile how the Framers of the Constitution could conclude that felons could not be trusted to wield pens in voting booths or jury rooms, but they simultaneously found them capable of wielding arms in the public square.").

Since convicted felons do not enjoy all the same rights as law-abiding citizens, constitutional inconsistency appears a foregone conclusion. Moreover, "the people" may take different meaning depending on the substance of the specific amendment in which it appears. *See, e.g.*, *United States v. Price*, No. 21 CR 164, 2023 WL 1970251, at *4 (N.D. Ill. Feb. 13, 2023) (observing that the consistent-rights "argument ignores differences between the rights protected by the First and Second Amendments, as the exercise of rights under the First Amendment do not put at risk the physical safety of others. That, in the Court's view, is an appropriate basis to 'apply a different rule' to the Second Amendment than to the First or Fourteenth."). At best, the meaning of "the people" across constitutional provisions is inconclusive. Regardless, it is unnecessary to adopt any overarching theory on the phrase to resolve this case.

Finally, acknowledging that the right of "the people" to bear arms has limits, *Range* draws a distinction between those who must always be "the people" and those who legislatures may constitutionally exclude. *See Range*, 69 F.4th at 102. The Court can imagine a case where that distinction matters. But this is not that case. The question is whether Congress has constitutionally

excluded at least some non-violent convicted felons under § 922(g)(1). As explained, the answer is yes.

## II.    Historical Traditions

### A.  Felony Dispossession Historical Analogues

Assuming the Second Amendment's plain text does cover Hardy, the government has still met its burden in showing that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation" and does not violate the Second Amendment. *Bruen*, 142 S. Ct. at 2126. After *Bruen*, the Seventh Circuit clarified that a district court must engage in a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)" to determine if "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Atkinson v. Garland*, 70 F.4th 1018, 1021–22 (7th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2133). Thus, the government must present historical analogues to show there is a tradition of limiting the right to keep and bear arms that is aligned with § 922(g)(1).

In *United States v. Gates*, another court in this District, relying on similar government briefing as the one filed here, persuasively explained why § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. No. 1:22-CR-00397-1, 2023 WL 5748362, at *5–9 (N.D. Ill. Sept. 6, 2023). The government offers two categories of historical analogues to modern-day-felony dispossession statutes: (1) "laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms" and (2) "laws authorizing capital punishment and estate forfeiture for felonies." (Dkt. 23 at 17–18).

First, the government presents evidence that seventeenth century England disarmed Catholics because England deemed them as untrustworthy to adhere to the rule of law. After the English Civil War, nonconforming Protestants, including pacifist denominations like Quakers,

refused to sign loyalty oaths that acknowledged the monarchy's authority over religion. *See* Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285, 304 n.117 (1983). Therefore, the monarchy accused the nonconforming Protestants of believing that their faith exempted them from obedience of the law and disarmed them. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994). Similarly, American colonies deprived many pacificists the right to bear arms because they objected to oath-taking on religious grounds. *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006). Several colonial American legislatures also passed dispossession regulations targeting Native Americans and enslaved Black people, groups who were deemed dangerous to society at the time. Notably, the colonies disarmed members of the political community, including "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law"—in other words, felons. *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022).

This concept of dispossessing dangerous and untrustworthy members of society carried into the ratification debates surrounding the right to bear arms. *See Bruen*, 142 S. Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.") (quoting *Heller*, 554 U.S. at 634–35). For example, during the 1787 Constitutional Convention, the Antifederalists proposed a constitutional amendment regarding the right to bear arms that was the predecessor to the Second Amendment. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 628 (1971). The Antifederalists proposed that "no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*." *Id.* at 665 (emphasis added). Thus, the Founders recognized that

10

individuals who commit crimes or pose a danger to society should not be protected by the Second Amendment. *See, e.g.*, *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty.").

Hardy disputes these analogues as not "distinctly familiar" or "relevantly similar" to the modern-day felony dispossession under § 922(g)(1) and asserts that the government has failed to show historical evidence suggesting that felons specifically were disarmed. For example, he argues that the English and American colonial laws did not disarm untrustworthy individuals who may have broken the law—only those who engaged in seditious activity and treasonous revolt. But engaging in seditious activity and treasonous revolt is a felony. At best, Hardy has shown the upper bounds of when firearm dispossession was appropriate. But his arguments do not cast doubt on the fact that England and colonial America had also disarmed dangerous and untrustworthy individuals. Furthermore, Hardy misunderstands the government's burden. *Bruen* "requires only that the government identify a well-established and representative historical analogue, not a historical twin." 142 S. Ct. at 2133. So a failure to show a historical dispossession specifically referencing "felon" is not dispositive; the government has, however, convincingly shown a historical tradition of disarming dangerous and untrustworthy individuals who would fall under today's definition of a felon.

Next, the government cites to historical regulations where the colonies punished felons through capital punishment, estate forfeiture, or both. *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in judgment) (commenting that capital punishment for felonies were ubiquitous during the 18th century and was the standard penalty for all serious crimes) (citing

Stuart Banner, *The Death Penalty: An American History* 23 (2002)); *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (finding capital punishment and forfeiture of estate were commonly authorized punishments in the colony). For example, in Maryland, individuals convicted of embezzling or altering any will or record that caused an injury to another person's estate or inheritance would be forced to surrender their own personal and real property. 1 *The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811). Virginia adopted a similar punishment for forgery convictions. 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302–03 (1821) (1777 Va. forgery law). And three years before the Second Amendment was ratified, New York passed a law imposing the death penalty for crimes such as counterfeiting. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 664–65 (1886) (1788 N.Y. law).

The First Congress, which drafted and proposed the Second Amendment, made several felonies, including non-violent felonies like forgery and counterfeiting, punishable by death. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112–15 (1790). Therefore, common sense dictates that firearm dispossession for felons is a "comparable burden on the right of armed self-defense" when the historical alternatives were death or surrendering one's assets. Reviewing these historical analogues together, the Court finds the government has

adequately demonstrated that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

### B. As-Applied Challenge

Hardy does not explicitly make an as-applied challenge, but within his motion, he mentions that his previous convictions did not involve "any use of force, attempted to use force, or threatened to use force against the person or property of another." (Dkt. 20 at 2). Thus, he implies that § 922(g)(1) is unconstitutional as applied to his case where his previous convictions were drugs-related. Hardy's challenge still falls short.

In *Atkinson*, the Seventh Circuit stated if a defendant calls for a distinction between violent and non-violent crimes under § 922(g)(1), the defendant must present historical evidence to justify a different outcome. *Atkinson*, 70 F.4th at 1024. But Hardy has not presented any historical evidence to support such an individualized assessment or a carveout for non-violent felonies. *See id.* at 1023 ("[Atkinson] does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes."). To the contrary, the historical evidence points to the opposite conclusion—laws in American colonies and seventeenth century England suggest that felons, both violent and non-violent, were targeted for firearm dispossession. As such, Hardy's as-applied challenge is rejected.

### CONCLUSION

For these reasons, the Court denies Hardy's Motion to Dismiss. [20]

_____
Virginia M. Kendall
United States District Judge

Date: October 13, 2023